UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**KRISTEN J. QUAIL**,                    Case No. 1:12 CV 925

        Plaintiff,                    Judge Patricia A. Gaughan

   v.                    AMENDED
                    REPORT AND RECOMMENDATION
**COMMISSIONER OF SOCIAL
SECURITY**,

        Defendant.                    Magistrate Judge James R. Knepp II

### INTRODUCTION

Plaintiff Kristen J. Quail seeks judicial review of Defendant Commissioner of Social Security's decision to deny Disability Insurance Benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 405(g). This case was referred to the undersigned for the filing of a Report and Recommendation pursuant to Local Rule 72.2. (Non-document entry dated April 17, 2012). For the reasons given below, the Court recommends that the Commissioner's decision denying benefits be affirmed..

### BACKGROUND

On December 2, 2008, Plaintiff filed an application for DIB stating she was disabled due to bipolar disorder and neurological muscle seizures, and she alleged a disability onset date of October 12, 2007. (Tr. 164, 184). Her claim was denied initially (Tr. 125) and on reconsideration (Tr. 130). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 133). Born June 21, 1959, Plaintiff was 52 years old when the hearing was held on April 28, 2011. (Tr. 27, 164). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 21, 27–120).

<u>Reports to the Agency</u>

Plaintiff explained she suffered from unpredictable muscle spasms, which limited her ability to move and drive and sometimes caused her to vomit. (Tr. 185). She said she suffered symptoms such as disconnected thoughts, fatigue, stiffness, depression, pain, confusion, and sleep problems. (Tr. 217, 224). Plaintiff reported taking a number of medications, did not report side effects, and believed they helped her conditions. (Tr. 190–91, 217, 223). She said her condition prevented her from sitting, standing, or laying down for long periods. (Tr. 201). She also reported stress and mental problems from bipolar disorder. (Tr. 201). Plaintiff explained she slept more than fifteen hours per day due to severe depression, did not bathe regularly, and drove infrequently. (Tr. 207, 211, 218). However, Plaintiff also said she could drive and went out alone, further reporting she shopped in stores and online. (Tr. 219).

Plaintiff reported living in a house with family. (Tr. 216). She said she only sometimes cooked and generally did not prepare complete meals due to difficulty staying on her feet. (Tr. 218). Plaintiff said she and a housekeeper worked on household chores together, she shared other duties with her husband, and they hired a lawn service for yard work. (Tr. 219). Her reported hobbies included watching television, feeding and watching birds, and some cooking. (Tr. 220). She explained she generally did these things every day, but only did basic cooking and sometimes forgot to fill the bird feeders. (Tr. 220). Plaintiff said she no longer socialized with many of her friends. (Tr. 220). She also said she used a cane and had a handicap sticker for her car, which she stated a doctor had prescribed. (Tr. 222).

Plaintiff said her typical day consisted of waking up multiple times per night due to racing thoughts and taking Xanax to go back to sleep. (Tr. 226). She said she watched television, read,

2

walked on her patio, and tried to do household chores. (Tr. 226). At one point, Plaintiff's mother-in-law lived with Plaintiff and her husband, and Plaintiff helped care for her mother-in-law by giving her medications and making food for her. (Tr. 226). Plaintiff reported she and her husband both fed their cat. (Tr. 226). She explained her conditions prevented her from working full time, driving like she used to, cooking complex meals, gardening, and being on her feet. (Tr. 226).

Vocational History

Plaintiff graduated from high school and completed one year of college. (Tr. 191). She worked from 1993 to 2007 in sales jobs, making a good salary. (Tr. 185, 194). Prior to her sales positions, Plaintiff worked as a collections rep and a part-time stand-up comic. (Tr. 194).

Medical Evidence Prior to Alleged Onset Date

Plaintiff saw her primary care physician Dr. Jack Rutkowski on February 20, 2007 and complained of severe lower back pain, shoulder pain, and neck pain after falling the previous day. (Tr. 386). An x-ray of her lumbar spine showed degenerative endplate changes and osteophyte formation, but vertebral bodies were in good alignment, there was no visible spondylolysis or spondylolisthesis, and no acute fracture. (Tr. 386, 447). Dr. Rutkowski diagnosed a lumbar-sacral sprain or strain and recommended "[c]onservative management". (Tr. 386). Plaintiff returned to Dr. Rutkowski continuing to complain of neck and lower back pain in March 2007, exhibiting tenderness, pain with movement, and symptoms of depression, for which Dr. Rutkowski prescribed NSAIDs, muscle relaxers, and Zoloft. (Tr. 384–85). Plaintiff saw Dr. Rutkowski with similar complaints prior to and shortly after her alleged onset date. (Tr. 395–99; *see* Tr. 164).

Treatment for Physical Impairments

Between November 6, 2007 and April 8, 2008, Plaintiff saw Dr. Rutkowski numerous times,

generally complaining of neck pain radiating into her right shoulder and arm, tingling, numbness, back pain radiating down her legs, and headaches. (Tr. 389–94). Her cervical spine muscles were tense, with pain on flexion and extension, she had decreased sensation in her right upper extremity and decreased grip strength in her right hand on one occasion, and she had lumbar-sacral tenderness and decreased range of motion. (Tr. 389–94). Dr. Rutkowski diagnosed cervical radiculopathy, lumbar-sacral radiculopathy and pain, insomnia, depression, and anxiety, and he prescribed NSAIDs, Lyrica, Vicodin, Skelaxin, Ambien, and Cymbalta. (Tr. 389–94).

On May 28, 2008, neurologist Dr. Judah R. Lindenberg evaluated Plaintiff and noted her reported muscle seizures and "TIAs" "sounded vaguely neurologic". (Tr. 312). Plaintiff was alert, attentive, and cooperative, with normal language and immediate recall. (Tr. 313). Her motor exam, cranial nerve exam, sensory exam, coordination, reflexes, and gait were steady. (Tr. 313). Dr. Lindenberg noted diffuse severe pain, possible superimposed muscles spasms, possible myofascial pain syndrome, and "[n]on-epileptic 'seizures'". (Tr. 313). He recommended an EMG, continued Plaintiff's muscle relaxants, and spent a significant amount of time discussing stress management with Plaintiff, as he said stress was "a clear symptom trigger." (Tr. 313). Dr. Lindenberg's notes also indicated Plaintiff's symptoms were much better on increased Xanax. (Tr. 314). On July 31, 2008, an EMG was normal. (Tr. 316).

Plaintiff returned to Dr. Rutkowski a number of times between May 30, 2008 and August 20, 2008, again complaining of lower back pain, neck stiffness, spasms, and anxiety. (Tr. 387–88, 623–24). Dr. Rutkowski's physical findings, diagnoses, and treatment plan remained the same as on prior occasions. (Tr. 387–88, 623–24).

Plaintiff went to the ER on August 28, 2008 complaining of abdominal pain, vomiting, and

4

back pain. (Tr. 319–20). Her physical examination was normal, but x-rays of Plaintiff's lumbosacral spine showed mild degenerative changes. (Tr. 319, 327). A CT scan of her abdomen and pelvis showed an umbilical hernia. (Tr. 228–29). On September 18, 2008, Plaintiff saw Dr. Rutkowski and complained of continuing muscle spasms, but her physical examination was normal. (Tr. 622).

Plaintiff saw neurologist Dr. Kerry H. Levin at the Cleveland Clinic Neurologic Institute on October 2, 2008 and described her history of muscle cramps worsening over the years. (Tr. 371). Plaintiff also reported several attacks so severe she required emergency treatment, muscle relaxants, and pain medication. (Tr. 371). She said her attacks typically occurred at night after mild to moderate physical activities throughout the day, further explaining the episodes occurred up to four times a week. (Tr. 371). Dr. Levin noted Plaintiff had no history of joint pain, no myalgias, and no depression or anxiety symptoms. (Tr. 371–72). Plaintiff was in no apparent distress, had a full range of motion in her neck without tenderness, good back flexion and extension with no pain, and normal extremities. (Tr. 373). She said she was depressed and exhibited a labile mood, but showed no psychomotor retardation or blunted affect. (Tr. 373). Plaintiff also reported problems walking, washing, dressing herself, and performing usual activities, extreme pain, and moderate anxiety or depression. (Tr. 375).

Plaintiff was oriented, and her remote and recent memory, attention span, concentration, language, and fund of knowledge were normal. (Tr. 373). Her physical examination was normal except for rare, impersistent right-left sensory differences. (Tr. 373). Dr. Levin noted the "segmental nature" of Plaintiff's symptoms was somewhat atypical. (Tr. 374). She ruled out a number of diagnoses as improbable, further noting Plaintiff showed no evidence of a neuromuscular disease and all lab studies were normal. (Tr. 374). Dr. Levin determined cramps might be the only unifying

diagnosis and advised Plaintiff on general lifestyle modifications to help with the cramps, such as avoiding caffeine and stretching prior to bedtime. (Tr. 374).

Plaintiff saw Dr. Rutkowski on October 21, 2008 and complained of pain in her neck, right shoulder, and right leg, along with problems with depression and bipolar disorder. (Tr. 621).

On November 13, 2008, Plaintiff saw Dr. Levin, said she believed stretching exercises had helped her, and reported she was working on decreasing her caffeine intake. (Tr. 367). Plaintiff's physical and neurological examinations were normal. (Tr. 367). Dr. Levin said Plaintiff's muscle spasm symptoms had improved. (Tr. 367). Plaintiff asked Dr. Levin "about the potential for obtaining social security disability related to her spasms", but Dr. Levin told Plaintiff "[h]er symptoms [we]re intermittent enough that it [wa]s unlikely that disability status would be awarded". (Tr. 367). She stated it was possible, though, that disability could be awarded based on her psychiatric illness, which Dr. Levin described as "at least as disabling as her muscle spasms if not more." (Tr. 367).

Plaintiff saw Dr. Rutkowski on November 13, 2008 and December 10, 2008 for routine check-ups and medication refills, and physical examinations revealed normal findings. (Tr. 619–20).

On March 19, 2009, Plaintiff followed up with Dr. Levin, concerned that a change in medications caused a change in her symptoms. (Tr. 472, 590–93).  Plaintiff said her muscle spasms were less frequent, shorter, and less intense. (Tr. 472). She explained she could do more than she used to be able to do, reporting her muscle spasms were less severe after she decreased her caffeine intake, started drinking more water, and started stretching. (Tr. 472). She also indicated Neurontin may have helped. (Tr. 472). She was concerned because of muscle twitching and tremors in her hands, which she said started when her medications were changed. (Tr. 472). Physical examination

6

revealed Plaintiff had a full neck range of motion without tenderness; good flexion and extension in her back, with no pain to palpation or percussion; normal recent and remote memory, attention span, concentration, language, and fund of knowledge; and a mildly labile mood. (Tr. 473). Her motor exam, reflexes, sensation, and gait were normal. (Tr. 473–74). Treatment notes revealed Plaintiff's bipolar disorder appeared to respond well to treatment and stated Plaintiff's muscle spasms appeared to have improved overall through treatment that mainly included lifestyle modifications. (Tr. 474). Dr. Levin noted the tremors could be caused by Seroquel or Cymbalta, but stated the benefits of those medications outweighed the side effects. (Tr. 474). To treat the muscle spasms, Dr. Levin recommended tonic water, more stretching, and physical therapy. (Tr. 474).

Plaintiff saw podiatrist Dr. Donahue on April 28, 2009 complaining of longstanding pain in her heels. (Tr. 564). She said she was no longer working because she could not control her emotions. (Tr. 564). Plaintiff told Dr. Donahue that Dr. Levin told her a missing enzyme caused her muscle spasms. (Tr. 564). She said Seroquel had helped stopped her leg cramps and spasms, reporting she was pleased with her progress and liked to garden. (Tr. 564).

When Plaintiff went to physical therapy on May 12, 2009, she complained of lower extremity pain. (Tr. 549, 552). She also stated she a birth defect had resulted in her missing some enzymes, which caused spasms. (Tr. 552). She had some diminished hip and ankle strength and  ambulated independently, but had a limp and used the hand rail as needed. (Tr. 553). Plaintiff also had some heel and calf tenderness, but neurological findings were normal. (Tr. 553). Plaintiff was diagnosed with muscle spasms, pain, and gait problems, and the therapist noted functional limitations. (Tr. 550). Plaintiff's potential was listed as "good". (Tr. 550).

Plaintiff returned to Dr. Donahue on May 12, 2009 and stated she had improved. (Tr. 560).

7

Plaintiff attended physical therapy on May 22, 2009 and May 26, 2009, reporting recent spasms. (Tr. 548–49). On May 26, 2009, she saw Dr. Donahue and complained of pain but stated it was "much improved". (Tr. 558–59). Plaintiff went to physical therapy on May 28, 2009 stating her pain was better overall. (Tr. 548). Plaintiff had difficulty performing some exercises that day. (Tr. 548). When Plaintiff went to physical therapy on June 3, 2009, she reported her spasms had occurred more frequently due to increased exercise, but she tolerated her exercises well. (Tr. 547).

On June 10, 2009, Plaintiff went to the Elyria Regional Medical Center complaining of left foot pain and x-rays revealed some multifocal degenerative changes with bone spurring. (Tr. 541, 543). Plaintiff attended physical therapy several times in June 2009. At these visits, she was progressing toward independence with land and aquatic home exercises, was doing "ok", and had no new complaints. (Tr. 546–47, 551). The therapist doubted whether Plaintiff was complying with her home exercise program, but she had very good tolerance for her exercises during the session. (Tr. 551). On July 2, 2009, Plaintiff failed to show up for her appointment with Dr. Donahue. (Tr. 558). Plaintiff also did not attend her final physical therapy appointment. (Tr. 551).

Plaintiff saw Dr. Rutkowski for monthly follow-up appointments and medication refills between February 18, 2009 and September 3, 2009, and had normal physical examinations at these appointments, though she did occasionally complain of leg pain and heel pain. (Tr. 578–84, 644).

On October 14, 2009, Plaintiff wrote to neurologist Dr. Levin explaining she had recently had a severe spasm and pulled many muscles during the spasm. (Tr. 231). She explained her recovery took days and she could not work because she could not handle attendance policies due to the number of bad days she had. (Tr. 231).

Plaintiff continued seeing Dr. Rutkowski regularly between October 15, 2009 and December

8

18, 2010, generally for medication refills and follow-up appointments. At these appointments, she complained of right handed numbness, swelling, and tingling; radiating lower back pain with tingling in her legs; muscle cramps and convulsions; and upper extremity and knee pain (Tr. 637–43, 645, 666). Plaintiff's physical examinations were normal, and Dr. Rutkowski refilled and adjusted her prescriptions and diagnosed, variously, restless leg syndrome, carpal tunnel syndrome, and lumbar radiculopathy (Tr. 637–43, 645, 666).

Plaintiff returned to podiatrist Dr. Donahue on February 28, 2011 asking for advice on how to manage her foot condition long term. (Tr. 649). She also brought Social Security paperwork asking Dr. Donahue to document her foot condition so she could "use this to try to get Social Security Disability." (Tr. 649). Plaintiff told Dr. Donahue she helped her husband with his business because she could not hold a job due to her muscle spasms. (Tr. 649). Dr. Donahue diagnosed degenerative joint disease of her left mid-foot and retrocalcaneal left heel spurs. (Tr. 649). He recommended a number of treatments that Plaintiff elected not to use. (Tr. 650). Additionally, he told Plaintiff he did not find enough evidence to support a disability claim, stating many of his patients had worse degenerative arthritis than Plaintiff had, yet they "continue[d] to work and function and contribute to their economic well[-]being." (Tr. 650).

On March 15, 2011 and April 13, 2011, Plaintiff saw Dr. Rutkowski for medication refills and her physical examinations were normal. (Tr. 660, 665).

Treatment for Mental Impairments

On October 23, 2008, Plaintiff was psychiatrically evaluated at the Marymount Hospital Behavioral Health Center. (Tr. 332). She reported extreme mood swings, racing thoughts, hopelessness, and feeling overwhelmed. (Tr. 343). Plaintiff was extremely upset and labile, began

crying, and was admitted to the hospital because she expressed suicidal ideation. (Tr. 332). While hospitalized, Plaintiff told psychiatrist Dr. Jung El-Mallawany she had suffered from muscle seizures since childhood, but they had been getting worse. (Tr. 332). She reported life stressors, but said she had never been suicidal and felt she had been misunderstood. (Tr. 332). Notes indicated Plaintiff and her husband ran a welding fabrication business. (Tr. 333). She said her marriage was good and she got along very well with her older sister. (Tr. 333). Plaintiff was eager to explain she was not suicidal, and she was reasonable in her conversation. (Tr. 333). Her mood was somewhat despondent and her affect somewhat anxious. (Tr. 333). She was preoccupied with her rare muscle disorder, and felt helpless and hopeless about it. (Tr. 333).

Plaintiff was diagnosed with a mood disorder, not otherwise specified, secondary to a medical condition. (Tr. 333). She reported Cymbalta was helping her. (Tr. 334). Plaintiff also attended occupational therapy while in the hospital, and the therapist noted she was cooperative, but had a flat or sad affect and was frustrated, overwhelmed, irritable, and discouraged. (Tr. 347). Plaintiff could sustain a conversation, but had attention problems and was impaired in judgment, problem solving, and coping skills. (Tr. 347–48). Notes indicated Plaintiff was independent in personal care and home living, except she needed help with medication management and safety procedures. (Tr. 348). During treatment, Plaintiff reported she had formerly been involved in Alcoholics Anonymous and currently smoked cigarettes, but she did not report any other prior drug use. (Tr. 338, 340). She also stated she had previously seen a therapist for mental diagnoses. (Tr. 340). Plaintiff said she was unemployed and dependent on her husband's income. (Tr. 338). She was discharged on October 24, 2008 and encouraged to follow through with therapy, and Dr. El-Mallawany thought her prognosis could be fair with continued treatment. (Tr. 334).

10

Plaintiff saw Dr. El-Mallawany on November 17, 2008 for follow-up care. (Tr. 504). Dr. El-Mallawany described her symptoms as unusual and stated Plaintiff was still quite unstable and very symptomatic. (Tr. 504). She also noted difficulties due to Plaintiff's muscle spasms. (Tr. 504). Plaintiff reported she worked until 2005 and was currently working for her husband. (Tr. 505). She also said she had an older sister, who was very supportive. (Tr. 505). Dr. El-Mallawany "d[id] not disagree with the diagnosis of bipolar disorder" and stated Plaintiff was extremely preoccupied with somatic symptoms. (Tr. 505). She recommended Plaintiff attend intensive outpatient psychotherapy and told Plaintiff her medications needed to be monitored more regularly. (Tr. 505).

Plaintiff continued to see Dr. El-Mallawany approximately twice a month, showing overall improvement with some relapses. On November 24, 2008, Plaintiff was still very anxious and tremulous. (Tr. 454). Dr. El-Mallawany adjusted Plaintiff's medications and indicated Plaintiff was slightly better. (Tr. 454). On December 5, 2008, Plaintiff seemed a little bit better and more relaxed. (Tr. 453). She said Seroquel was helping her, but reported recent discomfort due to muscle spasms. (Tr. 453). Dr. El-Mallawany again adjusted Plaintiff's medications and noted Plaintiff was making some progress. (Tr. 453). On December 15, 2008, Dr. El-Mallawany noted Plaintiff was a little better and was less distraught and distressed. (Tr. 451). Notes also indicated Plaintiff's muscle spasms had improved, and she reported Seroquel and Neurontin "ha[d] helped her tremendously." (Tr. 451). Plaintiff was less anxious, and her affect was more relaxed and animated. (Tr. 451). Dr. El-Mallawany said she was making good progress and her medications were working. (Tr. 451). Plaintiff saw Dr. El-Mallawany again on December 29, 2008 and still felt depressed, but her muscle spasms were better and though Plaintiff had suicidal thoughts, she said she would not commit suicide. (Tr. 449). Dr. El-Mallawany noted Plaintiff was improving, but her depression was

11

surfacing more, which may have been due to the holidays. (Tr. 449).

On January 7, 2009, Plaintiff had a better affect and looked healthier. (Tr. 455). Plaintiff told Dr. El-Mallawany she had a bad muscle spasm the previous night, but Dr. El-Mallawany noted the fact that she had still come to her appointment showed progress. (Tr. 455). Plaintiff complained of racing thoughts, but said medications were making her muscle spasms more tolerable and she felt better. (Tr. 455). Dr. El-Mallawany specifically noted, "[S]he is coming along. It is encouraging" and said Plaintiff was "making pretty good progress." (Tr. 455). On January 14, 2009, Dr. El-Mallawany again reported Plaintiff was doing better. (Tr. 463). Plaintiff said her medications had "been helping her tremendously and she fe[lt] really good about it." (Tr. 463). On January 26, 2009, Dr. El-Mallawany noted Plaintiff was a bit better and trying to maintain her progress. (Tr. 462). Plaintiff reported her spasms were much better, explaining she was very grateful for the improvement and could function better. (Tr. 462). Once again, Dr. El-Mallawany reported Plaintiff was "coming along" and continued her medications. (Tr. 462). Though Plaintiff was still symptomatic and had residual symptoms to be monitored, Dr. El-Mallawany said she had improved a lot. (Tr. 462).

Plaintiff attended counseling with Dr. Daniel Jones several days later, described her mood as chaotic, and thought her psychiatric medications needed more time to be effective. (Tr. 461). She talked at length about health problems and her speech was quite disorganized, lacked focus, and showed racing thoughts. (Tr. 461). Dr. Jones described Plaintiff as "very disorganized and [] very symptomatic". (Tr. 461). On February 3, 2009, Dr. Wayne Leach from the Department of Psychology at Marymount Hospital noted Plaintiff had made some progress. (Tr. 489). He noted Plaintiff still needed to work on managing her mood and challenging unproductive thinking. (Tr.

12

489). Dr. Leach diagnosed bipolar disorder, rule out borderline personality disorder, and assigned a Global Assessment of Functioning (GAF) score between 55 and 60.[1] (Tr. 489–90). He also noted Plaintiff no longer required intensive outpatient psychological services, and referred her for regular continued treatment. (Tr. 490). On February 12, 2009, Plaintiff told Dr. Jones she had been very irritable and angry lately, and said her mood had been depressed and she had cried for four days. (Tr. 460). Plaintiff spoke rapidly, seemed to be flooding emotionally, and expressed conflict with her husband. (Tr. 460). She also complained about neurological problems. (Tr. 460). Toward the end of the session, Plaintiff was able to re-gather herself a little. (Tr. 460).

When Plaintiff saw Dr. El-Mallawany on February 13, 2009, she looked better physically, had a better affect and mood, and her psychomotor retardation was disappearing. (Tr. 458). Plaintiff did not look as overwhelmed and was not as agitated, but she was forgetful and "still all over the place in terms of her cognition." (Tr. 458). Plaintiff told Dr. El-Mallawany "on the whole she [wa]s feeling much, much better." (Tr. 458). Dr. El-Mallawany thought Plaintiff was better, but adjusted her medications to help with her symptoms and was concerned with her apparent cognitive impairment. (Tr. 458). On February 23, 2009, Plaintiff had improved about 50 percent, but was still "stiff, quite labile, and emotional." (Tr. 457). Dr. El-Mallawany noted Plaintiff experienced mood swings. (Tr. 457). Plaintiff reported her muscle spasms had improved, and Dr. El-Mallawany adjusted her medications and noted Plaintiff was very slowly improving. (Tr. 457).

Plaintiff next returned to Dr. El-Mallawany more than two months later, on May 13, 2009.

---

1. A GAF score of 51–60 reflects moderate symptoms (e.g., flat effect and circumstantial speech) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 34 (4th ed., Text Rev. 2000) (*DSM-IV-TR*).

(Tr. 501). Plaintiff's sister had called the office approximately three weeks earlier reporting Plaintiff was suicidal, but Plaintiff denied being suicidal. (Tr. 501). Plaintiff told Dr. El-Mallawany she had recently exchanged words with her sister at a bank and thought people only came to her when they wanted money. (Tr. 501). Dr. El-Mallawany advised Plaintiff on how to deal with her frustrations. (Tr. 502). Plaintiff said Seroquel helped her muscle spasms and she felt better. (Tr. 502). Dr. El-Mallawany noted Plaintiff was coming along, but still somewhat symptomatic. (Tr. 502). She adjusted Plaintiff's medications and recommended Plaintiff see a therapist. (Tr. 502).

Plaintiff did not see Dr. El-Mallawany again until April 1, 2010, almost a year after her last appointment. (Tr. 628; *see* Tr. 501–02). Plaintiff was "about the same, somewhat better, but still quite symptomatic." (Tr. 628). She was still having occasional muscle spasms, but was better. (Tr. 628). She reported she still felt angry and upset. (Tr. 628). Dr. El-Mallawany recommended adding Depakote for mood stabilization because Plaintiff was still "quite angry, upset, and irritable and hurtful", noting she had planned to add Depakote in 2009, but Plaintiff had not come back to sessions. (Tr. 628). On April 22, 2010, Plaintiff was very irritable, tearful, and labile. (Tr. 656). She felt people took advantage of her and only found her useful when she gave them money. (Tr. 656). She also said her muscle spasms were bad, though not as bad as in the past. (Tr. 656). Plaintiff said Dr. Levin told her nothing could be done to help the spasms. (Tr. 656). She was upset the disability application process was not easy for her. (Tr. 656). Dr. El-Mallawany added Deplin to Plaintiff's medication regime and noted she would do her part in the disability application process because she did not think Plaintiff could work the way she was and she did not seem to be making further progress. (Tr. 656).

On August 6, 2010, Plaintiff told Dr. El-Mallawany she felt "a whole lot better" since

14

starting Deplin. (Tr. 655). She was not as anxious or depressed, felt more stable, was not crying, dwelling on her past, or blaming anyone, and Dr. El-Mallawany commented that she was pleasant. (Tr. 655). Plaintiff returned to Dr. El-Mallawany on November 29, 2010 and was "about the same." (Tr. 654). She reported she was depressed and reclusive all summer, staying in her room and crying, but was beginning to feel better. (Tr. 654). Plaintiff also reported muscle spasms, but said Seroquel helped. (Tr. 654). Dr. El-Mallawany recommended Plaintiff get a second opinion about her muscle spasms and continued her medications. (Tr. 654).

Opinion Evidence & Residual Functional Capacity (RFC) Assessments

*Dr. Thomas M. Evans – Consulting Psychologist*

On April 23, 2009, Dr. Evans performed a consultative psychological evaluation of Plaintiff. (Tr. 467–71). He noted Plaintiff drove herself to the evaluation and was irritable throughout the entire evaluation. (Tr. 467). Plaintiff told Dr. Evans she lived in a house with her husband and mother-in-law, had graduated high school and completed some college, had last been employed about a year earlier, and left her longest place of employment because she had difficulty getting along with co-workers. (Tr. 468). She said she abused alcohol in her mid-twenties, went to Alcoholics Anonymous in the 1980s, and had last used alcohol in December 2008. (Tr. 468). Plaintiff reported limited use of illegal drugs during her teen years, but denied ever abusing drugs. (Tr. 468). She also described her history of physical and mental health treatment. (Tr. 468).

Plaintiff was casually dressed, with adequate grooming and hygiene. (Tr. 468). Her ambulation was within normal limits and she sat comfortably in her seat throughout the evaluation. (Tr. 468–69). Plaintiff was cooperative and friendly, and "rapport was easily established and maintained." (Tr. 469). Plaintiff had normal speech, maintained good eye contact, said she slept well

on medication, described a diminished appetite, and described her current mood as "crappy". (Tr. 469). Plaintiff said she did not manage her emotions well or deal well with stress or criticism, and she was observed to be irritable. (Tr. 469). She reported crying episodes, mood lability, and irritability. (Tr. 469). Plaintiff denied feelings of guilt and reported recent suicidal ideation, but no intent. (Tr. 469). Plaintiff denied experiencing anxiety symptoms, and Dr. Evans did not note features of anxiety. (Tr. 469).

Plaintiff's insight into her situation and problems was adequate, as was her social judgment. (Tr. 470). Plaintiff reported she and her husband shared household chores, but her husband did most of the grocery shopping. (Tr. 470). She said she generally tried to wake up at 7:30 a.m. to take medications before having coffee and helping her mother-in-law take her medications. (Tr. 470). She stated she was always tired and usually depressed. (Tr. 470). Plaintiff explained she could sometimes cook one meal a day. (Tr. 470). She said she went to doctor appointments but drove as little as possible due to concentration problems. (Tr. 470). Plaintiff reported she was tired, cried a lot, and was not interested in anything. (Tr. 473).

Dr. Evans believed Plaintiff met the diagnostic criteria for major depressive disorder, single episode, moderate. (Tr. 470). He also diagnosed personality disorder, not otherwise specified. (Tr. 470). He reiterated that Plaintiff was irritable and used profane language throughout the evaluation, but he was able to establish and maintain a rapport. (Tr. 470). Dr. Evans found Plaintiff's ability to concentrate and pay attention not impaired because she sustained concentration and attention throughout the entire interview, was alert, and did not need questions to be repeated. (Tr. 470). He stated her ability to understand and follow simple repetitive directions was not impaired, and found her intellectual functioning appeared average. (Tr. 470). Dr. Evans opined Plaintiff's ability to

16

withstand stress and pressure was markedly impaired, "given her current depression." (Tr. 470). He also stated her ability to relate to others and deal with the general public was markedly impaired. (Tr. 470). Dr. Evans assigned Plaintiff a GAF of 40.[2] (Tr. 471).

*Consulting Psychiatrist Dr. Patricia Semmelman – Mental RFC Assessment*

Dr. Semmelman stated Plaintiff suffered from a mood disorder, not otherwise specified and a personality disorder, not otherwise specified. (Tr. 516, 520). She stated Plaintiff had mild limitations in activities of daily living, moderate difficulties maintaining social functioning, moderate difficulties maintaining concentration, persistence, and pace, and no episodes of decompensation, each of extended duration. (Tr. 523). She also found Plaintiff moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to changes in the work setting. (Tr. 527–28). Dr. Semmelman found Plaintiff not significantly limited in all other areas of functioning. (Tr. 527–28). She summarized Plaintiff's psychiatric treatment history and assigned minimal weight to consulting examiner Dr. Evans's report, stating it was quite inconsistent with how Plaintiff presented to her treating psychiatric sources. (Tr. 529). Dr. Semmelman opined Plaintiff could interact occasionally and superficially, receive instructions and ask questions appropriately in a work setting, and cope with ordinary and routine changes in a work setting that was not fast-paced or of high demand. (Tr. 529).

---

2. A GAF score between 31 and 40 indicates some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *DSM-IV-TR*, 34.

*Consulting Physician Dr. James Gahman – Physical RFC Assessment*

On May 27, 2009, Dr. James Gahman assessed Plaintiff's physical RFC and found she could perform medium work with no postural limitations. (Tr. 532–39). He summarized Plaintiff's treatment history for muscle spasms and other medical issues, noting normal physical findings, and found Plaintiff's reported symptom-severity inconsistent with the evidence based on Plaintiff's activities and medical evidence supporting a "clean bill of health." (Tr. 533, 537).

*Treating Physician Dr. Rutkowski – Physical and Mental RFC Assessments*

Dr. Rutkowski assessed Plaintiff's physical RFC on November 2, 2009 and opined she was limited to less than sedentary work, which even Plaintiff's attorney agreed was "a bit of a stretch." (Tr. 33, 635–36).

Dr. Rutkowski assessed Plaintiff's mental RFC in May 2011, finding she would be distracted up to ten percent of the day in understanding, remembering, and carrying out very short, simple instructions, asking simple instructions, or requesting assistance. (Tr. 658–59). He believed she would be distracted up to twenty percent of the day in:

> remembering locations and work-like procedures; performing activities within a schedule, maintaining regular attendance, and/or being punctual within customary tolerances; sustaining an ordinary routine without special supervision; making simple work-related decisions; being aware of normal hazards and taking appropriate precautions; and traveling in unfamiliar places or using public transportation.

(Tr. 658–59). Dr. Rutkowski opined Plaintiff would be distracted more than twenty percent of the day in:

> understanding, remembering, and carrying out detailed instructions; maintaining attention for extended periods; working in coordination with or proximity to others without being distracted by them; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintaining socially appropriate behavior and adhering to basic

18

standards of neatness and cleanliness; responding appropriately to changes in the work setting; and setting realistic goals or making plans independently of others.

(Tr. 658–59). He did not find her totally unable to function in any areas. (Tr. 658–59). He also failed to indicate an opinion on her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms or perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 658–59). Further, Dr. Rutkowski did not explain his summary conclusions or include any information clarifying the limitations he indicated. (Tr. 659).

*Treating Psychiatrist Dr. El-Mallawany – Mental RFC Assessment*

Dr. El-Mallawany completed a mental RFC assessment on April 1, 2010. (Tr. 632–33). She stated Plaintiff would be distracted up to twenty percent of the work day in:

understanding, remembering, and carrying out very short, simple instructions; making simple work-related decisions; asking simple questions or requesting assistance; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness.

(Tr. 632–33). She stated Plaintiff would be distracted more than twenty percent of the work day in:

remembering locations and work-like procedures; understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods of time; sustaining an ordinary routine without special supervision; accepting instructions and responding appropriately to criticism from supervisors; being aware of normal hazards and taking appropriate precautions; and traveling in unfamiliar places or using public transportation.

(Tr. 632–33). Finally, Dr. El-Mallawany opined Plaintiff would never be able to perform the following tasks on a regular, reliable, and sustained schedule:

performing activities within a schedule; maintaining regular attendance and/or being punctual within customary tolerances; working in coordination with or proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods;

19

> interacting appropriately with the general public; getting along with coworkers or peers without distracting them or exhibiting behavior extremes; responding appropriately to changes in the work setting; and setting realistic goals or making plans independently of others.

(Tr. 632–33). However, Dr. El-Mallawany did not explain her summary conclusions as requested, or include any information clarifying the limits in Plaintiff's functioning. (*See* Tr. 633).

Dr. El-Mallawany filled out another form assessing Plaintiff's mental RFC on March 14, 2011. (Tr. 652–53). She stated Plaintiff would be distracted up to ten percent of the work day in understanding, remembering, and carrying out very short, simple instructions. (Tr. 652). She said Plaintiff would be distracted up to twenty percent of the work day in:

> remembering locations and work like procedures; making simple work-related decisions; asking simple questions or requesting assistance; being aware of normal hazards and taking appropriate precautions; and traveling in unfamiliar places or using public transportation.

(Tr. 652–53). Additionally, Dr. El-Mallawany opined Plaintiff would be distracted more than twenty percent of the work day in:

> understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and/or being punctual within customary tolerances; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being distracted by them; interacting appropriately with the general public; accepting instructions from and responding appropriately to criticism from supervisors; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; and responding appropriately to changes in the work setting.

(Tr. 652–53). Dr. El-Mallawany believed Plaintiff could not perform the following functions on a regular, reliable, and sustained schedule:

completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and setting realistic goals or making plans independently of others.

(Tr. 652–53). She explained Plaintiff had an unusual medical problem causing her to suffer pain and muscle spasms, a very labile mood, was unable to cope with daily life stressors, and could not function most of the time. (Tr. 653). She also indicated Plaintiff had a hard time finding medications that could help her. (Tr. 653).

*Psychologist Dr. Cate Brandon – Mental RFC Assessment*

Dr. Brandon saw Plaintiff for two sessions, diagnosed her with bipolar disorder, and said Plaintiff presented as very emotionally labile and aggressive, with racing and tangential thoughts. (Tr. 576). Dr. Brandon indicated Plaintiff appeared to have difficulty handling daily stressors and life events, opining her medication regime did not appear to have stabilized her mood. (Tr. 576). On August 21, 2009, Dr. Brandon opined Plaintiff was of average intelligence, with adequate memory and no confusion but fair-to-poor concentration, poor insight, and extremely low frustration tolerance. (Tr. 586). She said Plaintiff could complete daily living tasks, but shifts in mood affected her ability to complete more demanding tasks. (Tr. 586). Dr. Brandon described Plaintiff's self care as fair, but said Plaintiff often appeared disheveled and did not participate in many enjoyable activities. (Tr. 586). She reported Plaintiff had frequent conflicts with others, anger outbursts, and agitation in her interactions with professionals and social contacts. (Tr. 586). Dr. Brandon explained Plaintiff "quickly decompensate[d] with any stressful events". (Tr. 586). Additionally, Dr. Brandon said Plaintiff's symptoms had responded poorly to treatment. (Tr. 587).

## ALJ Hearing

At the hearing, Plaintiff's attorney explained that though Plaintiff suffered from muscle spasms and pain, bipolar disorder was the primary reason for her alleged disability. (Tr. 31).

Plaintiff testified at length about her muscle spasms, explaining a rare genetic disease caused

21

extremely painful spasms daily, which sometimes required emergency care. (Tr. 39–41, 61). She stated a doctor had told her she should not drive, but could not specify when he told her that and later acknowledged she "d[id not] think [they] really . . . talked about it that much." (Tr. 45–46). Further, she stated she had not told the truth about her spasms when she got her license renewed because she wanted to continue having a valid license, even though she testified she sometimes went for months without leaving the house. (Tr. 46–47). Plaintiff said her husband owned a small welding fabrication business, but when the ALJ questioned her about records indicating she helped him with the business, she minimized her involvement. (Tr. 51–54, 91–92).

Plaintiff testified she took a number of medications and did not have side effects from them, but she felt her depression was not as improved as it could be and medications only sometimes helped her spasms. (Tr. 59–62). She said she had a major spasm "at least once a week." (Tr. 69–70). She also said her feet were extremely arthritic and she had carpal tunnel syndrome causing fine motor coordination issues, but had not had surgery. (Tr. 63, 73–74). Plaintiff stated she did not remember life without depression and explained she had no tolerance for listening to people's problems. (Tr. 66, 68). She reported sleeping a lot, becoming upset, and crying. (Tr. 69). She also explained she angered and frustrated easily. (Tr. 98–99). Plaintiff said she only got dressed about half the time and did not bathe regularly. (Tr. 77–78). She testified she never saw her friends anymore because she lacked interest in socializing, but she reported she talked to her sister every morning and saw her sister every two or three months. (Tr. 80–82, 84–85). Plaintiff also stated she rarely went out with her husband, had trouble concentrating, and could not pay the bills, but testified she and her husband went on vacations together. (Tr. 80–81, 85–86).

Plaintiff was very vague when the ALJ questioned her about how much she could lift and

how long she could sit or stand. (Tr. 70–72). She said she never went grocery shopping, but could wash the dishes using a dishwasher, watched television, went outside, did the laundry with her husband, cleaned the house with the help of a cleaning lady, and did some cooking including making simple meals for dinner. (Tr. 75–76). Plaintiff explained she and her husband had bird feeders, which she thought she could fill if her husband did not do it, and also reported her hobbies included watching and feeding a variety of wildlife, such as squirrels and wild turkeys. (Tr. 83–84).

Plaintiff reported previous alcohol addiction and admitted there were "not many substances you could list that [she had] not tried." (Tr. 87–89). She said she lost her previous job after missing significant time due to medical issues, explaining her boss told her she could no longer perform her job. (Tr. 94). Her boss also complained that Plaintiff had sworn at him, Plaintiff did not go to the HR department as instructed, and she was ultimately terminated. (Tr. 94–95). She described an unsuccessful work attempt in 2008, stating she could not do the work load and could no longer "sort [her] brain out . . . to put together an advertising presentation." (Tr. 96).

Responding to the ALJ's hypothetical person – who could perform medium work limited to simple, routine, repetitive tasks performed in an environment free of fast-paced production requirements, involving only simple work-related decisions and routine workplace changes and only occasional, superficial contact with others – the VE testified such a person could perform multiple jobs existing in significant numbers in the national economy. (Tr. 102–04). With the same mental limitations, but limited to sedentary work, the VE similarly concluded the person could perform multiple jobs. (Tr. 104–05). The VE testified a person could not perform work in the national economy if she was off task up to twenty percent of the day in addition to regularly scheduled breaks or missed more than two workdays per month. (Tr. 106). Finally, the VE testified a person could not

23

sustain employment if she could not "work with in a schedule, or work in coordination with others, or complete a normal workday, or interact with the general public, or get along with coworkers." (Tr. 107–08).

Before the ALJ concluded the hearing, he questioned Plaintiff about rental properties she owned. (Tr. 110). Plaintiff testified she owned three rental properties and had rented and managed the properties for many years, including the years she claimed to be disabled. (Tr. 110–19).

ALJ Decision

The ALJ found Plaintiff's date last insured was December 31, 2012 and she had not engaged in substantial gainful activity since her alleged onset date. (Tr. 17). Though the ALJ found Plaintiff had a number of severe impairments – including depression, personality disorder, non-epileptic neuromuscular seizures, hernia, degenerative joint disease of her left foot, and degenerative disc disease of the lumbar spine – he found these impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17). The ALJ specifically stated Plaintiff had mild restrictions in activities of daily living, moderate difficulties with social functioning and concentration, persistence, and pace, and no episodes of decompensation that had been of extended duration. (Tr. 18). Considering the evidence, the ALJ assessed the following RFC:

> [She can] perform medium work . . . except that she is limited to simple, routine tasks performed in a work environment free of fast paced production requirements involving only simple work related decisions, and routine work place changes, and only occasional and superficial interaction with the public and co-workers.

(Tr. 18).

The ALJ found Plaintiff's complaints not credible because despite her alleged symptom severity, her neurological evaluation and EEG were normal, her lumbar scan showed only mild degenerative changes, and the state agency physician opined she could perform medium work. (Tr.

24

19). Further, the ALJ found her treating physicians' opinion were based on subjective complaints rather than objective medical evidence, citing a number of records indicating the absence of symptoms when Plaintiff took her medications. (Tr. 19). The ALJ also noted Plaintiff helped her husband run a business, managed rental properties, was talkative and articulate throughout the hearing, and was "very evasive and inconsistent". (Tr. 19). Based on her RFC and VE testimony, the ALJ concluded Plaintiff could perform work existing in significant numbers in the national economy. (Tr. 21). He therefore found her not disabled. (Tr. 21). The Appeals Council denied review (Tr. 1), making the ALJ's decision the final decision of the Commissioner.

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can she perform past relevant work?

5. Can the claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if she satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff alleges the ALJ erred two ways. First, she argues the ALJ "failed to articulate a valid basis for rejecting the treating and consulting source opinions." (Doc. 11, at 11–14). Second, Plaintiff contends the ALJ did not meet his burden at step five because he lacked substantial evidence to find Plaintiff could sustain competitive employment on a full-time basis. (Doc. 11, at 14–18). Specifically, Plaintiff argues the hypotheticals posed to the VE did not accurately portray Plaintiff's limitations. For the reasons described below, Plaintiff's arguments lack merit.

<u>Treating Physician Rule</u>

Plaintiff argues the ALJ incorrectly interpreted Dr. El-Mallawany's treatment notes and erred by failing to give any weight to her opinion. She states the record showed she continued to have symptoms and was not stabilized by medications. (Doc. 11, at 12). Plaintiff also argues the ALJ erred by failing to give weight to consultative examiner Dr. Evans's opinion, stating both he and Dr. El-Mallawany reached the same conclusions regarding her limitations.

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242. A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r*

27

*of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). When a treating physician's opinion does not meet

these criteria, an ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R.

§ 404.1527(c)(2).[3] In determining how much weight to afford a particular opinion, an ALJ must

consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and

extent; (3) supportability – the extent to which a physician supports his findings with medical signs

and laboratory findings; (4) consistency of the opinion with the record as a whole; and (5)

specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's

opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight

the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id*.

An ALJ's reasoning may be brief, *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009),

but failure to provide any reasoning requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399,

409–10 (6th Cir. 2009). Good reasons are required even when the ALJ's conclusion may be justified

based on the record as a whole. The reason-giving requirement exists, in part, to let claimants

understand the disposition of their cases, particularly in cases where a claimant knows his physician

has deemed him disabled and might be bewildered when told by an ALJ he is not, unless some

reason for the agency's decision is supplied. *Wilson*, 378 F.3d at 544 (quotations omitted). "The

requirement also ensures the ALJ applied the treating physician rule and permits meaningful review

of the ALJ's application of the rule." *Id.*

---

3. 20 C.F.R. § 404.1527(d) – the regulation section defining the treating physician rule – was recently renumbered to § 404.1527(c) due to revisions not affecting the provision or rule. 77 FR 10650, at *10656 (Feb. 23, 2012). Many cases cite § 404.1527(d) to explain the rule but the undersigned will cite the current and correct citation throughout this order.

*Dr. El-Mallawany*

Dr. El-Mallawany concluded Plaintiff's functioning was extremely limited and she would be unable to sustain employment. (Tr. 632–33, 652–53). The ALJ did not err in disregarding this opinion because, as he stated, it was not based on objective medical evidence, was inconsistent with treatment notes and Plaintiff's testimony, was largely based on Plaintiff's subjective complaints, and records showed Plaintiff was often evasive and inconsistent, making her not credible. (Tr. 19).

Plaintiff attempts to describe Dr. El-Mallawany's records as supporting her findings of extreme limitation, but Dr. El-Mallawany's records and other records show Plaintiff made consistent progress with a few relapses. Most of Dr. El-Mallawany's records indicated at least some improvement, even when Plaintiff remained symptomatic, and some records showed significant improvement. (Tr. 449, 451, 453–55, 457–58, 462–63, 502, 628, 654–55). Plaintiff consistently reported medications were helping both her psychiatric and physical conditions. (Tr. 334, 451, 453, 455, 462–63, 502, 654–55). Even after Plaintiff had not seen Dr. El-Mallawany for more than two months, Plaintiff felt her muscle spasms were better, and she was "coming along". (Tr. 502). And though Plaintiff's condition did somewhat deteriorate after she had not seen Dr. El-Mallawany for almost a year, Dr. El-Mallawany described her condition as "about the same, somewhat better" and she quickly began to improve again once she resumed treatment. (Tr. 628, 654–56).

Furthermore, the record was replete with inconsistencies in Plaintiff's symptom reports, and despite Plaintiff's attempt to convince the Court otherwise, these inconsistencies do shed doubt on her subjective reports to mental health professionals. Though Dr. El-Mallawany indicated Plaintiff would have great difficulty with social interactions, Plaintiff's reports showed for the most part she got along well with her supportive sister, talked to her sister every day, saw her sister every few

29

months, was friends with her housekeeper, lived with and helped her mother-in-law for a time, and managed rental properties. (Tr. 81–82, 84–85, 109–19, 226, 333, 468, 470, 505). Plaintiff told the ALJ medication did not help her depression enough, but reported – both to the agency and to her doctors – that she thought medications helped. (Tr. 60, 223, 334, 451, 463, 655). She said she drove infrequently, but also said she could drive and go out alone and drove herself to the consultative examination with Dr. Evans. (Tr. 185, 207, 219, 467, 470). She told the ALJ a doctor had advised her not to drive, but later backed down and acknowledged they had not discussed it much. (Tr. 45–46). Plaintiff said a doctor had prescribed a cane and handicap sticker for her, but the medical records contained no indication this was true. (Tr. 222). She also said she could no longer garden, but mentioned gardening to a physician. (Tr. 226, 564).

Plaintiff continuously complained of muscle spasms, yet (despite her statements that it was a metabolic issue) no medical testing provided in the record confirmed a cause of her reported spasms. (Tr. 316, 346, 373–74, 552, 593–94, 649). Her physical examinations repeatedly revealed normal findings and though she did take medication for her condition, Dr. Levin noted Plaintiff's spasms improved mainly due to simple lifestyle changes. (Tr. 313, 319, 367, 373–74, 468–69, 472–74, 553, 564, 578–84, 619–20, 622–24, 637–45, 660, 665–66). Plaintiff also told the ALJ she had a major spasm at least once a week, even though medical evidence primarily indicated her spasms improved over time, became less severe, and happened less frequently. (*See, e.g.,* Tr. 367, 451, 449, 455–58, 462, 472, 474, 502, 564, 628).

Plaintiff was vague and evasive when questioned about her involvement with her husband's company, despite telling physicians she was working for him. (Tr. 51–54, 91–92, 333, 505, 649). Plaintiff said she was unemployed and dependent on her husband's income, and – until the ALJ

30

asked her about it – neglected to tell anyone she received rental income from properties she managed. (Tr. 109–19, 338). And despite her complaints of concentration difficulties, multiple examinations revealed Plaintiff had normal or adequate memory, attention span, and concentration. (Tr. 373, 470, 473, 586).

Other psychological opinions also conflict with Dr. El-Mallawany's assessment. Though consulting examiner Dr. Evans, who saw Plaintiff only once, did find Plaintiff was irritable with marked difficulties getting along with others, he also described her as cooperative and able to establish a rapport, with no concentration problems, adequate insight and social judgment, an unimpaired ability to follow simple directions, and average intelligence. (Tr. 467–71). As state agency consultant Dr. Semmelman noted, the marked difficulties Dr. Evans assessed were "quite inconsistent" with Plaintiff's presentation to treating sources. (Tr. 529).

Dr. El-Mallawany's records and other records indicated consistent improvement in Plaintiff's conditions, rendering Dr. El-Mallawany's opinion inconsistent with the medical evidence. Further, Plaintiff's credibility problems lessen the reliability of the subjective complaints on which Dr. El-Mallawany relied. By citing inconsistency with the record and Plaintiff's credibility issues, the ALJ gave good reasons for refusing to give weight to Dr. El-Mallawany's opinion, and substantial evidence supports his decision.

*Dr. Evans*

Dr. Evans opined Plaintiff was markedly impaired in withstanding stress and pressure and relating to others. (Tr. 470). The record does not support this level of impairment, as discussed at length above. Plaintiff showed consistent improvement; medications improved her condition; she generally got along with her sister, cleaning lady, and husband and even helped care for her mother-

31

in-law; and as Dr. Semmelman said when she discounted Dr. Evans's opinion, Plaintiff's presentation at the consultative examination was largely inconsistent with the signs of improvement she showed when presenting to treating sources. (Tr. 529). Combined with Plaintiff's pervasive credibility issues, the ALJ did not err by failing to give weight to Dr. Evans's conclusions.

The Commissioner Met His Step Five Burden

Once an ALJ has determined a plaintiff cannot perform her past relevant work, the burden shifts to the Commissioner at step five to show there are other jobs in significant numbers in the economy the plaintiff can perform, consistent with her RFC, age, education, and work experience. *Cole v. Sec'y of Health & Human Servs.*, 820 F.2d 768, 771 (6th Cir. 1987). The Commissioner may meet this burden by reference to the grids, unless the plaintiff suffers nonexertional limitations that significantly limit the range of work permitted by her exertional limitations. *Id. See also Kimbrough v. Sec'y of Health & Human Servs.*, 801 F.2d 794, 796 (6th Cir. 1986). If a plaintiff has exertional *and* nonexertional impairments, the ALJ cannot rely solely on the grids. *Santilli v. Astrue*, 2012 WL 609382, *3 (N.D. Ohio 2012).

To meet his burden at the step five, the Commissioner must make a finding "'supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Education & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id.* If an ALJ relies on a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations. *Ealy*, 594 F.3d at 516-17; *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)

(explaining that although an ALJ need not list a claimant's medical conditions, the hypothetical should provide the VE with the ALJ's assessment of what the claimant "can and cannot do"). "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

The ALJ asked the VE to consider a number of mental restrictions he felt accurately portrayed Plaintiff's limitations, limiting her to simple, routine, repetitive tasks performed in an environment free of fast-paced production requirements, involving simple, work-related decisions and routine workplace changes, with only occasional, superficial interaction with the public and coworkers. (Tr. 103). Ultimately, the ALJ adopted these limitations into Plaintiff's RFC. (Tr. 18).

The same substantial evidence supporting the ALJ's decision not to give weight to Dr. El-Mallawany's or Dr. Evans's opinions supports his RFC findings. The limitations Plaintiff argues should have been included in the RFC, which the VE testified would preclude her from employment, came directly from Dr. El-Mallawany's or Dr. Evans's opinions. The ALJ did not err in giving those opinions no weight, and he did not err by failing to incorporate them into Plaintiff's RFC. He found those opinions did not represent Plaintiff's actual level of limitation and incorporated numerous restrictions that do account for her level of mental limitation. Specifically, the ALJ accommodated Plaintiff's difficulties dealing with stress by limiting her to simple tasks in a low-stress environment. And he accommodated her social challenges by limiting her to occasional, superficial interaction with others. The VE stated a person with the RFC the ALJ assigned to Plaintiff could perform numerous jobs. (Tr. 102–04). In fact, the VE testified a person with Plaintiff's mental impairments could work even if limited to sedentary work. (Tr. 104–05). The ALJ did not err by relying on this

evidence to meet the burden at step five, and substantial evidence therefore supports his decision finding her not disabled.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and applicable law, the Court should find substantial evidence supports the Commissioner's decision denying DIB benefits. The undersigned therefore recommends affirming the Commissioner's decision.

s/James R. Knepp, II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).